No. 22-55453

In the

# United States Court of Appeals

*for the*

# Ninth Circuit

DAVID MARKS, an individual, on behalf of himself and all others similarly situated

*Plaintiff and Appellant*,

vs.

UMG RECORDINGS, INC., a Delaware Corporation; CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, and DOES 1-10,

*Defendants and Respondents.*

Appeal From United States District Court,
Central District of California, Case No. 2:21-cv-04043-MCS-JPR
The Honorable Mark C. Scarsi, presiding

## OPENING BRIEF FOR PLAINTIFF-APPELLANT

DANIEL L. WARSHAW
BOBBY POUYA
MATTHEW A. PEARSON
**PEARSON, SIMON &
WARSHAW, LLP**
15165 Ventura Blvd., Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300

NEVILLE L. JOHNSON
DOUGLAS L. JOHNSON
DANIEL L. LIFSCHITZ
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, CA 90210
Telephone: (310) 975-1080

*Counsel for Plaintiff-Appellant
(Additional Counsel Listed on Inside Cover)*

980655.1

JEFFREY A. KONCIUS
NICOLE RAMIREZ
KEVIN D. ZIPSER
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Telephone: (310) 854-4444

*Additional Counsel for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................1

II.   SUMMARY OF THE ARGUMENT ......................................2

III.  STATEMENT OF JURISDICTION ...................................10

IV.  STATEMENT OF ISSUES PRESENTED FOR REVIEW........11

V.   STATEMENT OF THE CASE ............................................11

    A.    Factual Background...............................................11

    B.    Procedural History.................................................18

         1.    The Original and First Amended Complaints...........18

         2.    The Second Amended Complaint ...........................19

VI.  STANDARD OF REVIEW..................................................22

VII. ARGUMENT......................................................................23

    A.    Marks Has Sufficiently Alleged Fraud ................23

         1.    Respondents Misrepresented Marks' Streaming Royalties......23

         2.    Respondents Knew Their Representations Were Inaccurate, Intending to Defraud Marks and Induce Reliance...........................................................24

         3.    Marks Justifiably Relied on Respondents' Misrepresentations ....................................................25

         4.    Respondents' Misrepresentations Damaged Marks.................26

         5.    Marks Has Satisfied Rule 9(b)'s Pleading Standard.................27

    B.    Marks Has Sufficiently Alleged Breach of Contract ..........................32

         1.    Marks Has a Contractual Right to Streaming Royalties..........32

         2.    Marks Has Performed Under The Parties' Agreements ..........35

         3.    Respondents Breached Their Contractual Obligations.............35

         4.    Respondents' Breach Caused Damage to Marks.....................37

    C.    Marks Is Entitled to Declaratory Relief ..............38

1.      Declaratory Relief May Be Used to Establish a
        Conditional Right to Rescind Marks' Agreements with
        Respondents ................................................................... 38

2.      Rescission May Be Predicated On Frustration of Purpose
        Due to Streaming's Cannibalization of Physical Record
        Sales ............................................................................... 41

3.      Marks Was Not Required to Return All Past Royalties in
        Order to Seek a Declaration of Rights Regarding
        Rescission ....................................................................... 42

VIII.   CONCLUSION ............................................................................ 44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*20th Century Lites, Inc. v. Goodman*,
    64 Cal. App. 2d Supp. 938 (1944) ....................................................................41

*Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*,
    No. 11-CV-246-IEG RBB, 2013 WL 2351814
    (S.D. Cal. May 24, 2013) ..............................................................................*passim*

*Belloc v. Davis*,
    38 Cal. 242 (1869) ...........................................................................................7

*Benson v. Ocwen Loan Servicing, LLC*,
    No. CV 11-06674 SJO, 2011 WL 13223540
    (C.D. Cal. Sept. 30, 2011), *aff'd*, 562 F. App'x 567 (9th Cir. 2014) ................40

*Biggs v. Bank of Am. Corp.*,
    No. EDCV 15-00267-VAP, 2017 WL 11648863
    (C.D. Cal. July 28, 2017) .................................................................................29

*Bradshaw v. Catlett*,
    No. CV 04-4117 CAS (SSX), 2006 WL 8436644
    (C.D. Cal. July 27, 2006), *aff'd*, 274 F. App'x 533 (9th Cir. 2008) ...................16

*Carruth v. Fritch*,
    36 Cal. 2d 426 (1950) .........................................................................................9

*Cirulli v. Hyundai Motor Co.*,
    No. SACV 08-0854 AG (MLGx), 2009 WL 5788762
    (C.D. Cal. June 12, 2009) ..................................................................................28

*Cole v. Wright Med. Tech. Inc.*,
    No 2:20-cv-03993-RGK-E, 2020 WL 5846460
    (C.D. Cal. July 27, 2020) ...................................................................................28

*Connell v. Zaid*,
    268 Cal. App. 2d 788 (1969) .............................................................................19

*Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.*,
   29 Cal. 4th 189 (2002) ............................................................19, 20, 30

*Daugherty Co. v. Kimberly-Clark Corp.*,
   14 Cal. App. 3d 151 (1971) ........................................................15, 32

*Davis v. Capitol Recs., LLC*,
   No. 12-cv-1602 YGR, 2013 WL 1701746
   (N.D. Cal. Apr. 18, 2013) ...................................................................25

*Diamond Woodworks, Inc. v. Argonaut Ins. Co.*,
   109 Cal. App. 4th 1020 (2003) ...........................................................16

*Doan v. State Farm General Ins. Co.*,
   195 Cal. App. 4th 1082 (2011) ...........................................................39

*Doe v. Gangland Prods.*,
   730 F.3d 946 (9th Cir. 2013) ..............................................................38

*Doe v. Uber Techs., Inc.*,
   184 F. Supp. 3d 774 (N.D. Cal. 2016)................................................29

*Durkee v. Cota*,
   74 Cal. 313 (1887) ..............................................................................19

*E-P Constructors, Inc. v. Peterson Tractor Co.*,
   192 Cal. App. 2d 518 (1961) ..............................................................34

*Engalla v. Permanente Med. Grp., Inc.*,
   15 Cal. 4th 951 (1997) ........................................................................23

*Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*,
   23 F.4th 1195 (9th Cir. 2022) .............................................................22

*F.B.T. Prods., LLC v. Aftermath Records*,
   621 F.3d 958 (9th Cir. 2010) ..........................................................3, 14

*Fifty-Six Hope Rd. v. Jammin Java Corp.*,
   No. 2:16-cv-05810-SVW-MRW, 2017 WL 2719981
   (C.D. Cal. Feb. 22, 2017), *aff'd sub nom, Hope Rd. Merch. LLC v.*
   *Jammin Java Corp.*, 747 F. App'x 622 (9th Cir. 2019) .....................38

*Food Mkt. Merch., Inc. v. California Milk Processor Bd.*,
   No. 2:15-cv-01083-TLN-CKD, 2020 WL 2194013
   (E.D. Cal. May 6, 2020) ...................................................................25

*Foxx v. Williams*,
   244 Cal. App. 2d 223 (1966) ...........................................................12

*FPI Dev., Inc. v. Nakashima*,
   231 Cal. App. 3d 367 (1991) ...........................................................42

*Frezza v. Google Inc.*,
   No. 5:12-cv-00237-RMW, 2013 WL 1736788
   (N.D. Cal. Apr. 22, 2013) ...............................................................33

*G.P.P., Inc. v. Guardian Prot. Prod., Inc.*,
   No. 1:15-cv-00321-SKO, 2017 WL 1881385
   (E.D. Cal. May 9, 2017) ..............................................................3, 15

*In re Gen. Motors LLC CP4 Fuel Pump Litig.*,
   393 F. Supp. 3d 871 (N.D. Cal. 2019) .............................................31

*Gov't Emples. Ins. Co. v. Dizol*,
   133 F.3d 1220 (9th Cir. 1998) .........................................................39

*Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*,
   175 Cal. App. 4th 1306 (2009) ........................................................14

*Healy v. Brewster*,
   251 Cal. App. 2d 541 (1967) .............................................................8

*Hedging Concepts, Inc. v. First Alliance Mortg. Co.*,
   41 Cal. App. 4th 1410 (1996). .........................................................42

*Huong Que, Inc. v. Luu*,
   150 Cal. App. 4th 400 (2007) ..........................................................37

*I.B. v. Facebook, Inc.*,
   905 F. Supp. 2d 989 (N.D. Cal. 2012) .............................................41

*Indep. Living Ctr. of S. Cal., Inc. v. Kent*,
   909 F.3d 272 (9th Cir. 2018) ...........................................................38

*Insight Psychology & Addiction, Inc. v. City of Costa Mesa*,
No. SACV 20-00504 JVS (JDEx), 2021 WL 1218253
(C.D. Cal. Mar. 4, 2021) ..................................................................31

*Intelligent SCM, LLC v. Qannu PTY LTD.*,
No. CV 14-06417 MMM, 2015 WL 13916822
(C.D. Cal. Mar. 2, 2015) ...............................................................30, 31

*In re Interactive Network, Inc. Sec. Litig.*,
948 F. Supp. 917 (N.D. Cal. 1996) ....................................................6

*JDIS Grp., LLC v. 626 Holdings, LLC*,
No. SACV 20-994-DMG, 2021 WL 4813757
(C.D. Cal. June 7, 2021) .........................................................8, 22, 43

*Kelley v. Owens*,
120 Cal. 502 (1898) ...........................................................................9

*Krobitzsch v. Middleton*,
72 Cal. App. 2d 804 (1946) ...............................................................7

*Lazar v. Superior Court*,
12 Cal. 4th 631 (1996) .....................................................................26

*Lemus v. Rite Aid Corp.*,
No. SA CV 22-00253-DOC-ADS, 2022 WL 2721385
(C.D. Cal. July 7, 2022) ...................................................................24

*Levine v. Tobin*,
210 Cal. App. 2d 67 (1962) .............................................................34

*Lloyd v. Murphy*,
25 Cal. 2d 48 (1944) ........................................................................41

*Maniar v. Cap. Bank of California*,
No. C-89-2774 MHP, 1993 WL 515880 (N.D. Cal. Dec. 6, 1993) ....................9

*Miles v. Deutsche Bank Nat'l Tr. Co.*,
236 Cal. App. 4th 394 (2015) ......................................................19, 30

*Mosqueda v. Am. Honda Motor Co.*,
443 F. Supp. 3d 1115 (C.D. Cal. 2020) ............................................28

*MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*,
  No. 2:21-cv-00360-JAD-DJA, 2022 WL 1001495
  (D. Nev. Feb. 9, 2022) ........................................................................20

*MWS Wire Indus. v. Cal. Fine Wire Co.*,
  797 F.2d 799 (9th Cir. 1986) ................................................8, 21, 34

*Nayab v. Cap. One Bank (USA), N.A.*,
  942 F.3d 480 (9th Cir. 2019) ...............................................................28

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ...................................................................29

*Nissan Motor Acceptance Cases*,
  63 Cal. App. 5th 793 (2021) ................................................................25

*Oasis W. Realty, LLC v. Goldman*,
  51 Cal. 4th 811 (2011) .........................................................................32

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ...............................................................24

*Patel v. Liebermensch*,
  45 Cal. 4th 344 (2008) ...........................................................................3

*Powertech Tech., Inc. v. Tessera, Inc.*,
  No. C 11-6121 CW, 2014 WL 171830 (N.D. Cal. Jan. 15, 2014) ....................37

*Produce Pay, Inc. v. Izguerra Produce, Inc.*,
  39 F.4th 1158 (9th Cir. 2022) ..............................................................22

*Pury v. Khalsa*,
  674 F. App'x 679 (9th Cir. 2017) .........................................................20

*R Power Biofuels, LLC v. Chemex LLC*,
  No. 16-CV-00716-LHK, 2017 WL 1164296
  (N.D. Cal. Mar. 29, 2017) ...................................................................27

*In re Real Estate Assocs. P'ship Litig.*,
  223 F. Supp. 2d 1109 (C.D. Cal. 2002) ..............................................39

*Rivington Partners, LLC v. Rovens*,
No. 21-cv-06151-LB, 2021 WL 8268051
(N.D. Cal. Dec. 10, 2021) ..................................................................................31

*Rodriguez v. Oto*,
212 Cal. App. 4th 1020 (2013) ........................................................................17

*Roley v. Google LLC*,
No. 18-cv-07537-BLF, 2019 WL 1779974
(N.D. Cal. Apr. 23, 2019) ...................................................................................33

*Runyan v. Pacific Air Industries, Inc.*,
2 Cal. 3d 304 (1970) ...................................................................................42, 43

*S. Ins. Co. v. Workers' Comp. Appeals Bd.*,
11 Cal. App. 5th 961 (2017) ............................................................................10

*Scherer v. FCA US*,
565 F. Supp. 3d 1184 (S.D. Cal. 2021) ...............................................................6

*Sharabianlou v. Karp*,
181 Cal. App. 4th 1133 (2010) .....................................................................9, 43

*Small v. Fritz Cos., Inc.*,
30 Cal. 4th 167 (2003) ........................................................................................7

*Stevens v. Superior Court*,
180 Cal. App. 3d 605 (1986) ............................................................................23

*Stewart v. Screen Gems-Emi Music, Inc.*,
81 F. Supp. 3d 938 (N.D. Cal. 2015)...................................................17, 35, 36

*Tan v. Quick Box, LLC*,
No. 3:20-cv-01082-H-DEB, 2020 WL 7226440
(S.D. Cal. Dec. 8, 2020)....................................................................................20

*Tavares v. Capitol Recs., LLC*,
No. 12-cv-3059 YGR, 2013 WL 968272 (N.D. Cal. Mar. 12, 2013) ...............25

*Thane Int'l, Inc. v. 9472541 Canada Inc.*,
No. CV 19-3125-MWF, 2020 WL 7416171
(C.D. Cal. Nov. 16, 2020)..............................................................................7, 35

ix

*Tire Hanger Corp. v. Rotary Lift*,
No. EDCV 15-2347 JGB (SPx), 2017 WL 10543660
(C.D. Cal. Oct. 4, 2017) .................................................................37

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc*.,
No. CV 14-3466 MMM, 2015 WL 12746208
(C.D. Cal. Oct. 30, 2015) ..............................................................26

*Union Oil Co. v. Terrible Herbst, Inc.*,
331 F.3d 735 (9th Cir. 2003) ..........................................................34

*United Studios of Self Def., Inc. v. Rinehart*,
No. 8:18-cv-01048-DOC-DFM, 2019 WL 1109682
(C.D. Cal. Feb. 22, 2019) ..............................................................39

*Vascular Imaging Prof'ls, Inc. v. Digirad Corp*.,
401 F. Supp. 3d 1005 (S.D. Cal. 2019) ...........................................40

*Waegemann v. Montgomery Ward & Co.*,
713 F.2d 452 (9th Cir. 1983) ..........................................................41

*Wagner v. Glendale Adventist Medical Center*,
216 Cal. App. 3d 1379 (1989) ..................................................32, 34

*Walters v. Calderon*,
25 Cal. App. 3d 863 (1972) ............................................................21

*Weatherly v. Universal Music Publ'g Grp*.,
125 Cal. App. 4th 913 (2004) ........................................................23

*Winograd v. Am. Broad. Co*.,
68 Cal. App. 4th 624 (1998) ..........................................................17

*Wong v. Stoler*,
237 Cal. App. 4th 1375 (2015) .................................................10, 43

## Statutes

28 U.S.C. § 2201 ...........................................................................39

Cal. Civ. Code § 1060 ....................................................................38

Cal. Civ. Code § 1605 ..................................................................8, 34

Cal. Civ. Code § 1691 ....................................................................10, 43

Cal. Civ. Code § 1692 ....................................................................42, 43

Fed. R. Civ. P. 9(a)................................................................................31

Fed. R. Civ. P. 9(b) .........................................................................28, 31

Fed. R. Civ. P. 12(b)(6)........................................................................22

**Other Authorities**

Chris Marple, *The Times They Are A-Changin': How Music's Mechanical Licensing System May Have Finally Moved Into The 21st Century*, 26 Rich. J.L. & Tech. 1 (2020) ....................................................13

Christopher Buccafusco & Kristelia García, *Pay-to-Playlist: The Commerce of Music Streaming*, 12 U.C. Irvine L. Rev. 805, 827 (2022)..............................................................................................13

Corbin on Contracts § 5.06 (2021) .........................................................21

Eriq Gardner, "For Some Rock Pioneers, Warner Music Treats Streaming Royalties as Charity," The Hollywood Reporter (Apr. 3, 2019).....................................................................................4

Friedlander, et al., "Year-End 2021 RIAA Revenue Statistics," Figure 2 (Mar. 2022) .......................................................................................1

H. Con. Res. 102, 117th Cong. 2nd Sess. (2022) ....................................1

Henry H. Perritt, Jr., *New Business Models for Music*, 18 Vill. Sports & Ent. L.J. 63 (2011) .........................................................................12

Lital Helman, *Fair Trade Copyright*, 36 Colum. J.L. & Arts 157, 162-163 (2013)..........................................................................................12

Rest. 2d Contracts, § 71 .........................................................................21

Rest. 2d Contracts, § 265 .........................................................................2

Ryan S. Henriquez, *Facing the Music on the Internet: Identifying Divergent Strategies for Different Segments of the Music Industry in Approaching Digital Distribution*, 7 UCLA Ent. L. Rev. 57, 127 n. 181 (1999) ....................................................................................13

Witkin, Summary of Cal. Law § 211 (2022) .........................................................21

## I.   INTRODUCTION

In this case, former Beach Boys member David Marks ("Marks" or "Appellant") sued the band's label, Capitol Records ("Capitol"), for secretly pocketing significant amounts of his foreign streaming royalties. Instead of stopping that practice, the district court held Capitol can legally pocket *all* streaming royalties it collects for artists like Marks – which now comprise 83% of all revenue generated by their recorded music.[1]

If the Ninth Circuit were to affirm the district court's holding, it would eviscerate the consideration underpinning thousands of legacy recording contracts and grant an incalculable windfall to not only Capitol, but all labels in the United States administering similar contracts. Scores of artists in their twilight years will be deprived of any right to share in the only significant revenue stream enjoyed by their recorded music, turning an already inequitable remuneration gap between the artists and their labels into a yawning chasm. This simply cannot be the law.

/ / /

---

[1] *See* Friedlander, et al., "Year-End 2021 RIAA Revenue Statistics," Figure 2 (Mar. 2022), available at https://www.riaa.com/wp-content/uploads/2022/03/2021-Year-End-Music-Industry-Revenue-Report.pdf; *see also* H. Con. Res. 102, 117th Cong. 2nd Sess. (2022) (noting in resolution recitals that "streaming music services have become the dominant method of music consumption, and presently account for roughly 83 percent of total recorded music revenue in the United States.").

## II. SUMMARY OF THE ARGUMENT

Marks contracted with Capitol between 1962 and 1972, at a time when the only compensable form of music distribution in existence was the sale of physical records. 2-ER-99, 2-ER-105-107.[2] Today, the sale of physical records comprises only 9% of all recorded music revenues, having been thoroughly cannibalized by the advent of digital streaming.[3] Marks' contracts, like thousands of other legacy artists, do not discuss what royalty he should be paid for digital streaming since the technology did not even exist when the contracts were executed.[4] A literal construction of Marks' contracts would therefore entitle him to payment of **only 0.45% to 1.08% of *all revenues*** generated by his musical works.[5]

This created a conundrum for Capitol and its parent label, UMG Recordings, Inc. ("UMG"). The very purpose of their legacy contracts was to sell physical records, and that purpose was now substantially frustrated by an unforeseeable paradigm shift in the way people were consuming recorded music. *See* Rest. 2d Contracts, § 265, com. a. (discussing contractual discharge by supervening

---

[2] Citations to "ECF No." refers to the ECF docket entries for the district court.

[3] Friedlander, et al., *supra*; 2-ER-107.

[4] 2-ER-107.

[5] *See* 2-ER-106. With physical records comprising 9% of all revenues, 5% of that amount (Marks' royalty for sales outside the United States) is 0.45%, and 12% of that amount (Marks' royalty for sales in the United States) is 1.08%.

frustration). To avoid a wave of rescission claims predicated on frustration of purpose, Capitol and UMG (collectively "Respondents") injected new consideration into their legacy agreements by adding a 50% artist royalty for digital streaming, which appeared on the royalty statements issued by Respondents. 2-ER-107.[6]

By adding a streaming royalty to save their legacy contracts from failure by the frustration of purpose, Respondents necessarily availed themselves of the principle of implied modification by conduct. *See, e.g.*, *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG (RBB), 2013 WL 2351814, at *4 (S.D. Cal. May 24, 2013) ("Under California law, a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause expressly prohibiting modification.").[7] However, while Respondents disclosed the existence and measure of the streaming royalty, they did **not** disclose any fees that could be deducted from it, such as intercompany administrative fees. As a result, no right to assess such fees could form part of the modification. 2-ER-107-108.[8]

---

[6] A 50% royalty is the industry standard for third-party licenses, like streaming, that do not impose any production or distribution costs on the record label. *See F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010).

[7] Under this doctrine, a mutual change in the parties' relationship acts as its own consideration. *See G.P.P., Inc. v. Guardian Prot. Prod., Inc*., No. 1:15-cv-00321-SKO, 2017 WL 1881385, at *10 n.12 (E.D. Cal. May 9, 2017) (collecting cases).

[8] California adheres to the objective theory of contracting, whereby only terms actually communicated by one party to another at the time of contracting can form part of their bargain. *See Patel v. Liebermensch*, 45 Cal. 4th 344, 352 (2008).

Once third-party auditors were given the opportunity to examine the structure of the new streaming royalty, it became clear that Respondents were not actually remitting the full 50% figure communicated to artists on their royalty statements; instead, Respondents were instructing their foreign affiliates to arbitrarily withhold a significant percentage of those revenues overseas, and by applying the 50% figure only to the amount remitted stateside, Respondents were able to clandestinely reduce the amount of royalties paid to all affected artists. 2-ER-107-108. This practice is particularly unjustifiable in the context of *streaming*, where the foreign affiliates have no significant distribution or collection costs to offset. 2-ER-108 (citing *Stewart v. Screen Gems-Emi Music, Inc*., 81 F. Supp. 3d 938, 966 (N.D. Cal. 2015)).

This litigation, as originally conceived, was only intended to challenge the propriety of Respondents assessing an arbitrary and hidden "intercompany charge" on foreign streaming revenues paid to their legacy artists. Respondents reacted to this challenge by exercising their 'nuclear option,' denying that Marks and similarly-situated artists have *any contractual right to streaming royalties whatsoever*, albeit more obliquely than when their counsel made an identical argument for Warner Bros. Records and were shellacked in the press for it.[9] 2-ER-80-81.

---

[9] *See, e.g.*, Eriq Gardner, "For Some Rock Pioneers, Warner Music Treats Streaming Royalties as Charity," The Hollywood Reporter (Apr. 3, 2019), available at

Even more unexpected than Respondents' brazen position, however, was the district court's embrace of it. Specifically, the district court held as follows:

1) That Marks was required to attach a contract or fraudulent royalty statement to his complaint, as well as identify precisely who implemented the fraudulent practice and when that occurred, in order to carry a fraud claim.[10]

2) That Marks was required to assume a new legal obligation in order for implied modification of his royalty entitlement to be supported by consideration, and that a change in legal relationship with the Respondents was insufficient.[11]

3) That Marks cannot pursue rescission in the event no breach of contract is found because he has affirmed his agreements by retaining past royalties.[12]

On the basis of these three findings, the district court held that all of Marks' claims failed and dismissed his complaint with prejudice. This was reversible error.

**_First,_** Marks specifically identified "what fraud occurred" (the hidden imposition of an arbitrary intercompany charge on his foreign streaming royalties),

---

https://www.hollywoodreporter.com/business/business-news/some-rock-pioneers-warner-music-sees-streaming-royalties-as-charity-1199221/.

[10] 1-ER-7 (citing Fed. R. Civ. P. 9(b)).

[11] 1-ER-7-8 (citing _Chi. Title Ins. Co. v. AMZ Ins. Servs., Inc_., 188 Cal. App. 4th 401, 423 (2010)).

[12] 1-ER-8 (citing _Broad. Music, Inc. v. Davis_, No. CV 10-10089-RGK (FFMx), 2012 WL 13008124, at *6 (C.D. Cal. Mar. 30, 2012)).

"when" (after the relatively recent creation of such royalty stream), and "through what instrument" (the written royalty statements periodically issued to Marks that state a purported royalty rate without disclosing the hidden charge reducing it), which is more than sufficient to carry a fraudulent omission claim. *Scherer v. FCA US*, 565 F. Supp. 3d 1184, 1189 (S.D. Cal. 2021) ("Although federal case law requires plaintiffs to allege fraud by omission in accordance with Rule 9(b), the particularity pleading standard is lowered on account of the reduced ability in an omission suit to specify the time, place, and specific content relative to a claim involving affirmative misrepresentations.") (internal quotes and citations omitted).

The district court's Order did not take into account how more discrete allegations of Respondents' fraud could not have been offered by Marks absent discovery into the behind-the-scenes workings of Respondents' royalty administration, which is precisely why the Ninth Circuit also relaxes the pleading requirements for a fraud claim when the nature of the fraud is corporate. *See In re Interactive Network, Inc. Sec. Litig.*, 948 F. Supp. 917, 920 (N.D. Cal. 1996) ("facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the fraud.") (quoting *In re Ross Systems Securities Litigation*, No. C-94-0017-DLJ, 1994 WL 583114, *5 (N.D. Cal. July 21, 1994)).

***Second,*** contrary to the district court's claim, the SAC *does* point to a new legal obligation Marks assumed after his last written agreement with Capitol in 1972: a legal obligation for Marks to suspend or forbear any potential rescission rights against Respondents so long as he is contractually provided with streaming royalties. *See, e.g.*, *Thane Int'l, Inc. v. 9472541 Canada Inc.*, No. CV 19-3125-MWF, 2020 WL 7416171, at *9 (C.D. Cal. Nov. 16, 2020) (plaintiff allowing defendants to utilize its intellectual property without bringing suit until defendants failed to pay royalties as dictated by the parties' agreement constituted valid consideration).

For more than 150 years, "[i]t [has been] well settled, that a forbearance to sue is a sufficient consideration to support a contract; and the instrument in question is not void for want of a sufficient consideration, even though the forbearance to sue was the only consideration." *Belloc v. Davis*, 38 Cal. 242, 256 (1869); *accord Krobitzsch v. Middleton*, 72 Cal. App. 2d 804, 809 (1946) ("It is settled law in California that [a]ny suspension or forbearance of a legal right constitutes a sufficient consideration . . . . Even though the forbearance is for one day only, there is a sufficient consideration as the law does not weigh the quantum.") (internal quotes and citations omitted); *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 174 (2003) ("Forbearance--the decision not to exercise a right or power--is sufficient consideration to support a contract and to overcome the statute of frauds.").

Indeed, consideration in California is expansive by statute, encompassing "*[a]ny* benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or *any* prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor[.]" Cal. Civ. Code § 1605 (emphasis added). To reject forbearance as good consideration and unilaterally narrow it to the assumption of only a legal obligation in the classically affirmative sense, as the district court did, would be to override the California legislature and jettison scores of contrary precedent, including that of the Ninth Circuit. *See MWS Wire Indus. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986) ("Under California law, 'forbearance to make use of some legal remedy is sufficient consideration for a promise. Also forbearance to press a claim or a promise of such forbearance, may be a sufficient consideration even though the claim is wholly ill founded.") (quoting *Healy v. Brewster*, 251 Cal. App. 2d 541, 551 (1967)).[13]

**Third,** the district court mistakenly assumed that Marks needed to return all past royalties to Respondents merely to seek *declaratory relief* regarding rescission. 1-ER-8; *see* 2-ER-125. Not only is that not a condition for seeking declaratory relief, it is not a condition for seeking rescission either. *See JDIS Grp., LLC v. 626*

---

[13] *Healy*, like this case, specifically concerned forbearance of a rescission claim.

*Holdings, LLC*, No. SACV 20-994-DMG (DFMx), 2021 WL 4813757, at *7 (C.D. Cal. June 7, 2021) ("Defendant does not cite to any authority to persuade the Court to require Plaintiffs to compensate Defendant in order to proceed with their claim for relief based upon rescission. The Civil Code does not provide that courts may 'adjust the equities' *before* rescission is granted.") (citing Cal. Civ. Code § 1692). Additionally, "[r]escission is intended to restore the parties as nearly as possible to their former positions." *Sharabianlou v. Karp*, 181 Cal. App. 4th 1133, 1144 (2010). Moreover, Marks giving up his past royalties while Respondents keep their portion would not in any sense return the parties to their former positions, which is why California law permits rescission to be effectuated by "offering to restore to the other party everything of value which he has received under the contract, *on the condition that the other party do so as well*." *Maniar v. Cap. Bank of California*, No. C-89-2774 MHP, 1993 WL 515880, at *3 (N.D. Cal. Dec. 6, 1993) (emphasis added).

As Respondents received royalties under the parties' agreements far in excess of what Marks has received, any eventual restoration from Marks would need to be offset by a reciprocal restoration from Respondents, and Respondents therefore cannot possibly be injuriously affected by Marks' 'failure' to restore his royalties. *Kelley v. Owens*, 120 Cal. 502, 510-11 (1898); *Carruth v. Fritch*, 36 Cal. 2d 426, 430 (1950). Indeed, if Respondents' position is that Marks' streaming royalties are extracontractual, there is no basis to require their forfeiture to perfect rescission at

all, since they would not constitute a benefit conferred pursuant to the parties' agreements. *See S. Ins. Co. v. Workers' Comp. Appeals Bd*., 11 Cal. App. 5th 961, 971 (2017) ("A rescission is effected under Civil Code section 1691 by giving notice of rescission and restoring, or offering to restore, everything of value *received under the contract*.") (emphasis added). Accordingly, a demand by Respondents for Marks to return his streaming royalties concedes a contractual obligation to pay them.

Lastly, if an offer of restoration by Marks were required, it would be satisfied by the service of Marks' complaint. *See* Cal. Civ. Code § 1691 ("When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both."); *accord Wong v. Stoler*, 237 Cal. App. 4th 1375, 1386 (2015). Thus, there was no legitimate barrier to the district court determining whether rescission was available to Marks in the absence of a contractual right to streaming royalties, and its refusal to render such a determination constitutes reversible error.

## III.   STATEMENT OF JURISDICTION

This appeal is taken from a final order and judgment of the United States District Court for the Central District of California. 1-ER-3-8, ECF No. 38 ("Judgment"). The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The Ninth Circuit has jurisdiction over this

action pursuant to 28 U.S.C. §§ 1291 and 1294(1). The district court entered its final judgment on April 6, 2022 (Judgment), and Marks timely filed a Notice of Appeal on May 3, 2022 (2-ER-129-138) pursuant to Fed. R. App. P. 4(a)(1)(A).

## IV.  STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Did Marks' cause of action for fraud satisfy the relevant pleading standards under Fed. R. Civ. Proc. 9(a) and 12(b)(6)?

2.  Did Marks' cause of action for breach of contract identify valid consideration to support an implied modification of contract?

3.  Did Marks' cause of action for declaratory relief entitle him to a declaration of rights regarding his ability to pursue rescission?

## V.  STATEMENT OF THE CASE

### A.  Factual Background

Defendant UMG is the holding company for, and Defendant Capitol one of the most venerable imprints of, Universal Music Group, the largest record label in the world. 2-ER-105. In the days before the modern internet and affordable home studio equipment made the cost of recording and distributing music a trivial affair, record labels such as Respondents operated as industry gatekeepers:

> The development and commercialization of tape recording in the late 1940s and early 1950s made audio recording more broadly available than before, but recording equipment was still expensive, and only a few possessed the skills necessary to edit tape. Moreover, manufacturing the vinyl disks from the master recording was a big deal, and within the capability of only a handful of pressing plants. A

musician had no prayer of making a record unless he hooked up with a recording studio.[14]

Because musicians were wholly dependent on record labels to facilitate their careers, the labels had excessive leverage in their contractual negotiations with artists. Accordingly, the most common arrangement was for artists to give up all rights to their music in exchange for a small royalty on copies sold by the label, and only once the label had recouped whatever funds were spent on recording the music. *See, e.g.*, *Foxx v. Williams*, 244 Cal. App. 2d 223, 233-34 (1966); Lital Helman, *Fair Trade Copyright*, 36 Colum. J.L. & Arts 157, 162-163 (2013).

Such was the case for David Marks, a legendary musician, recording artist, and performing artist who was a member of The Beach Boys. 2-ER-101-102. Marks signed his first record deal with Capitol's predecessor in 1962, under which he was to be paid a royalty of 5% to 10% upon the "gross sales of records." 2-ER-105. Neither the 1964 or 1972 amendments to Marks' record deal expanded the scope of use for which Marks was to be paid, still referring only to royalties for "records sold." 2-ER-106-107. Marks' agreements reflect standard record industry terms that Respondents have applied to many similarly situated artists. 2-ER-107.

---

[14] Henry H. Perritt, Jr., *New Business Models for Music*, 18 Vill. Sports & Ent. L.J. 63 (2011) (discussing the historical business models for recorded music).

12

The traditional justification for the outsized share of revenues retained by record labels was, as mentioned *supra*, the sheer cost of recording, manufacturing, and distributing phonorecords. This justification was also extended to affiliates and sub-publishers who assisted with distributing phonorecords in various foreign territories, which would retain a percentage of the collected revenues to offset their operational expenses. *See* Ryan S. Henriquez, *Facing the Music on the Internet: Identifying Divergent Strategies for Different Segments of the Music Industry in Approaching Digital Distribution*, 7 UCLA Ent. L. Rev. 57, 127 n. 181 (1999).

That justification no longer holds. Over the last two decades, music has become incredibly affordable to produce and distribute without needing any record label involvement whatsoever. Many musicians no longer even bother to make physical records for sale, as on-demand streaming provides a reliable flow of incremental revenue with no significant costs to recoup. *See* Christopher Buccafusco & Kristelia García, *Pay-to-Playlist: The Commerce of Music Streaming*, 12 U.C. Irvine L. Rev. 805, 827 (2022) ("Music producers no longer chase album sales, but rather streams."); *see also* Chris Marple, *The Times They Are A-Changin': How Music's Mechanical Licensing System May Have Finally Moved Into The 21st Century*, 26 Rich. J.L. & Tech. 1 (2020) ("For many artists, streaming allowed a direct-to-consumer platform that eliminated the costs of manufacturing, packaging, and shipping physical forms of music to record stores and fans.").

The Ninth Circuit has previously contended with the fact that digital distribution of music does not implicate traditional record sales, but rather third-party licenses, for which the traditional revenue split between artist and label is 50/50. *See F.B.T. Prods., LLC*, 621 F.3d at 964. For artists like Marks whose contracts are silent on the issue of third-party licensing revenues, however, the Ninth Circuit's pronouncements on the matter only served to bring the inadequacy of these legacy recording agreements into sharper relief. Instead of receiving an additional 50% of 83% of all revenues earned by his works, Marks was only earning 5 to 12% of 9%, all because nobody could foresee the advent of digital streaming in 1972.

Fortunately, California law does not leave artists like Marks powerless under such inequitable circumstances. "[W]here performance [of a contract] remains possible, but the reason the parties entered the agreement has been frustrated by a supervening circumstance that was not anticipated, such that the value of performance by the party standing on the contract is substantially destroyed, the doctrine of commercial frustration applies to excuse performance." *Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1336 (2009). The reason Marks and other artists entered into contracts with Respondents was to be compensated for the primary method by which the public consumed their art (i.e., sale of physical records). That method has now been utterly subsumed by a *new* form

14

of consumption (digital streaming) that no parties anticipated, thereby destroying the value of any recording contracts lacking a streaming royalty.

California law also provides a less drastic remedy to reform a broken contract than rescission for frustration of purpose, one which Respondents clearly availed themselves of: implied modification by conduct. *G.P.P., Inc.*, 2017 WL 1881385, at *8 ("California contract law recognizes the principle of implied modification by conduct.") (collecting cases). Pursuant to this doctrine, "[a]n agreement to modify a written contract will be implied if the conduct of the parties is inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify it." *Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal. App. 3d 151, 158 (1971) (citing *Garrison v. Edward Brown & Sons*, 25 Cal.2d 473, 479 (1944)).

Respondents do not deny that, once digital streaming upended the market for physical records, royalties for digital streaming suddenly appeared on accounting statements for Marks and other putative class members, with no apparent basis in their written agreements. 2-ER-107. The payment of royalties outside the scope of a written agreement is a classic case of implied modification by conduct under California law. *See Alvarado Orthopedic Rsch., L.P.*, 2013 WL 2351814 at *4.[15] The

---

[15] In *Alvarado*, the parties' written agreement only provided that a contracting party would receive royalties for "blades with BRAZOL coating," yet for several years, the defendant intentionally paid royalties for *non*-BRAZOL coated blades, and "[t]he conflict between the written agreement's express terms and the apparently

mutual consideration supporting this modification is self-evident; Respondents are rational economic actors and would not have voluntarily parted with significant revenues absent knowledge that the artists' acceptance of those revenues would nullify their ability to seek rescission for failure of consideration or frustration of purpose. 2-ER-107; *see Bradshaw v. Catlett*, No. CV 04-4117 CAS (SSX), 2006 WL 8436644, at *6–7 (C.D. Cal. July 27, 2006), *aff'd*, 274 F. App'x 533 (9th Cir. 2008) ("Consideration may be an act, forbearance, change in legal relations, or a promise.") (quoting 1 Witkin, Summary 11th Contracts § 202).

Critically, while Respondents' accounting statements specify the royalty type (streaming) and amount (50%) being added to artists' paychecks, they do not mention anything about permissible deductions or administrative fees. 2-ER-107-108; *compare* 2-ER-105 (disclosing in contract that Marks' 5% royalty for records sold would be calculated after deducting "returns, rebates and credits"), 2-ER-106 (same). This lack of disclosure is highly significant, as it is hornbook law that the

---

inconsistent conduct of the parties raise[d] genuine factual disputes as to whether the parties intended to modify the contract to provide royalties for non-BRAZOL coated blades." *Id.* at *4-5. This was in spite of the presence of a clause stating that the "parties may modify . . . the provisions of th[e] Agreement, but only by an instrument duly executed by both parties." *Id.* at *5; *accord Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1037-38 (2003) (finding "a textbook case of modification by conduct" despite the contract stating it "may be altered or amended only by written amendment signed by both parties").

16

terms of a contract are limited to those the parties actually communicate to one another. *See Winograd v. Am. Broad. Co*., 68 Cal. App. 4th 624, 632 (1998) ("The terms of a contract are determined by objective rather than by subjective criteria."); *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1027 (2013) (terms of an agreement do not include a contracting party's "unexpressed intentions or understanding").

Having failed to disclose (and therefore contractually obtain) any right to withhold an arbitrary percentage of streaming revenues from artists, Respondents nevertheless began to exercise such arbitrary withholding when it came to accounting for streaming revenues collected outside the United States. 2-ER-100-101. Respondents have never even *attempted* to articulate a justification for this practice, which amounts to "paying fees to its affiliated foreign sub-publishers 'at grossly higher than market rates for [their] services'" – a practice already found plausibly violative of California law in *Stewart*, 81 F. Supp. 3d at 965. In fact, the conduct in this case is arguably *more* egregious than in *Stewart* (which concerned sales of records), given that streaming platforms take on Respondents' traditional distribution obligations and can account for revenues on a global basis, thereby obviating any need for the services of foreign affiliates. 2-ER-108.

/ / /

/ / /

/ / /

### B. Procedural History

#### 1. *The Original and First Amended Complaints*

On May 14, 2021, Marks filed a putative class action against UMG based on the lack of any contractual or commercial justification for its practice of arbitrarily withholding foreign streaming revenues through the use of affiliated sub-publishers. Marks' original complaint asserted claims for: (1) breach of contract, (2) account stated, (3) fraud, (4) violation of California's Unfair Competition Law, (5) accounting, (6) breach of the implied covenant of good faith and fair dealing, and (7) declaratory relief, including as to the right of rescission. ECF No. 1.

On July 7, 2021, UMG moved to dismiss Marks' entire complaint under Fed. R. Civ. Proc. 12(b)(6) and 9(h). ECF No. 11. On July 21, 2021, Marks filed a superseding First Amended Complaint ("FAC"). ECF No. 15. On August 4, 2021, UMG moved to dismiss the FAC, again under Rule 12(b)(6). ECF No. 18. On August 18, 2021, Marks filed an opposition to UMG's motion. ECF No. 19. On August 25, 2021, UMG filed a reply in support of its motion. ECF No. 20.

On August 31, 2021, the district court granted UMG's motion to dismiss the FAC. ECF No. 21. Specifically, the district court dismissed Marks' fraud claim on the basis that "[Marks] attaches no contract or allegedly fraudulent royalty statement to the FAC, and makes no effort to narrow his serious fraud accusations to a reasonably discrete period or individual such that UMG can meaningfully respond."

*Id.* at 6. The district court also dismissed Marks' breach of contract claim on the basis that "[Marks'] FAC fails to identify a bargained-for provision requiring UMG to pay Plaintiff his claimed royalties, either in the [1972] Agreement or a royalty statement that memorializes an enforceable obligation for UMG to pay [Marks] and the nationwide putative classes royalties calculated based on 100% of revenues." *Id.* at 7. The district court dismissed Marks' remaining claims because they all failed in the absence of a payment obligation by UMG. *Id.* at 8.

### 2. *The Second Amended Complaint*

On October 4, 2021, Marks filed his Second Amended Complaint ("SAC"), now including the full text of his contractual royalty entitlements *in haec verba*, an approved method of pleading contractual claims in California for well over a century. 2-ER-105-107; *see Durkee v. Cota*, 74 Cal. 313, 315 (1887) ("It is perfectly proper to set out a contract *in haec verba*."); *accord Connell v. Zaid*, 268 Cal. App. 2d 788, 795 (1969). The SAC goes on to plead the implied terms created by Respondents' royalty statements according to their legal effect, which is also an acceptable practice for pleading contractual claims. 2-ER-107-108, 2-ER-114-115; *see Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co*., 29 Cal. 4th 189, 198-99 (2002) ("In an action based on a written contract, a plaintiff may plead the legal effect of the contract rather than its precise language."); *accord Miles v. Deutsche Bank Nat'l Tr. Co*., 236 Cal. App. 4th 394, 402 (2015) (holding "plaintiff's failure

either to attach or to set out verbatim the terms of [a] contract was not fatal to his breach of contract cause of action" based on *Constr. Protective Servs., Inc.*).

The SAC also provides all reasonably available facts upon which Marks' fraud claim is founded, which the Ninth Circuit has held to satisfy relevant pleading standards in corporate fraud cases, where the plaintiff cannot be expected to have personal knowledge of the facts constituting the wrongdoing. 2-ER-109-111, 2-ER-117-120; *see Pury v. Khalsa*, 674 F. App'x 679, 687 (9th Cir. 2017) (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds as stated in Flood v. Miller*, 35 F. App'x. 701, 703 n.3 (9th Cir. 2002)); *accord Tan v. Quick Box, LLC*, No. 3:20-cv-01082-H-DEB, 2020 WL 7226440, at *26 (S.D. Cal. Dec. 8, 2020); *MST Mgmt., LLC v. Chicago Doughnut Franchise Co., LLC*, No. 2:21-cv-00360-JAD-DJA, 2022 WL 1001495, at *3 (D. Nev. Feb. 9, 2022) ("the Ninth Circuit reaffirmed the basis of Wool—that plaintiffs needn't plead with particularity facts within the defendants' knowledge—as recently as 2019") (citing *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 494 (9th Cir. 2019)).

On January 6, 2022, Respondents[16] filed a motion to dismiss the SAC under Rule 12(b)(6) and 9(h). 2-ER-67-97. On January 20, 2022, Marks filed an opposition to Respondents' motion. 2-ER-25-58. On January 27, 2022, Respondents filed a

---

[16] The SAC added Capitol as a defendant alongside UMG. ECF Nos. 26, 28.

reply in support of their motion. 2-ER-11-24. On April 6, 2022, the district court granted Respondents' motion. 1-ER-3-8. The district court held that Marks "only presents excerpts of past contracts that do not mention digital streaming," ignoring Marks' pleading of the royalty statements' legal effect and imposing a pleading standard inconsistent with the Ninth Circuit's corporate fraud doctrine. 1-ER-7.

The district court further held that a change in legal relationship was insufficient to act as consideration for modifying the parties' agreements, holding that Marks was required to "have assumed some legal obligations," apparently beyond waiver or forbearance of potential rights. 1-ER-7 (citing *Chi. Title Ins. Co. v. AMZ Ins. Servs., Inc*., 188 Cal. App. 4th 401, 423 (2010)). This unduly restrictive definition of consideration is contrary to California and Ninth Circuit law. *See, e.g.*, *Walters v. Calderon*, 25 Cal. App. 3d 863, 873-74 (1972) ("The rule is that relinquishment or forbearance of a claimed right is good consideration for the creation of a new right, regardless of whether the claimed right actually was effective or not"); *MWS Wire Indus.*, 797 F.2d at 802; *see also* Rest. 2d Contracts, § 71 (1981) (valid consideration includes a forbearance); *accord* Witkin, Summary of Cal. Law § 211 (2022) (same); Corbin on Contracts § 5.06 (2021) (same).

Lastly, the district court held that by not returning his past royalties, Marks was necessarily affirming his agreements with Respondents and thus cannot seek to rescind them. 1-ER-8 (citing *Broad. Music, Inc. v. Davis*, No. CV 10-10089-RGK

(FFMx), 2012 WL 13008124, at *6 (C.D. Cal. Mar. 30, 2012)). This again misapprehended the nature of Marks' sought relief, which was a declaration of rights that, in the event Marks *cannot* sue for breach of contract (because no right to streaming royalties is found to exist), he should be able to rescind his agreements for failure of consideration and/or frustration of purpose. 2-ER-125. Marks had no obligation to preemptively surrender his royalties in order to seek rescission, let alone a basic declaration of rights. *JDIS Grp., LLC*, 2021 WL 4813757, at *7.

## VI. STANDARD OF REVIEW

Dismissal of a complaint under Rule 12(b)(6) is reviewed *de novo*, with this Court accepting all well-pleaded factual allegations in the complaint as true and construing the pleadings in the light most favorable to the plaintiff. *Produce Pay, Inc. v. Izguerra Produce, Inc*., 39 F.4th 1158, 1161 (9th Cir. 2022). "Dismissal is affirmed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims which would entitle it to relief." *Ernst & Haas Mgmt. Co. v. Hiscox, Inc*., 23 F.4th 1195, 1199 (9th Cir. 2022) (quoting *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020). Therefore, "[i]t is axiomatic that the motion to dismiss . . . is viewed with disfavor and is rarely granted." *Id.* (quoting *McDougal v. Cnty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991)).

/ / /

/ / /

## VII.  ARGUMENT

### A.  Marks Has Sufficiently Alleged Fraud

Under California law, the elements of a cause of action for fraud by deceit are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997). Marks has pled all of these elements.

#### 1.  *Respondents Misrepresented Marks' Streaming Royalties*

Record labels such as Respondents account to artists by providing them with periodic royalty statements that summarize the earnings of their works, and artists must be able to rely upon the accuracy of such statements. California courts have accordingly concluded that the failure to disclose deductions on royalty statements constitutes evidence of misrepresentation for purposes of fraud. *See Weatherly v. Universal Music Publ'g Grp.*, 125 Cal. App. 4th 913, 919-20 (2004).

Here, Respondents informed Marks on his royalty statements that he was being paid 50% of the money earned from the digital streaming of his works, with no accompanying disclosure of the intercompany charge that was reducing the pool of monies from which the 50% royalty was drawn. 2-ER-100-102, 2-ER-107-108. Respondents' failure to disclose this information constitutes an actionable misrepresentation and satisfies the first element of Marks' fraud claim. *See Stevens*

*v. Superior Court*, 180 Cal. App. 3d 605, 609 (1986) ("Where failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative misrepresentation is tenuous. Both are fraudulent.") (quoting *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 37 (1975)).

### 2. *Respondents Knew Their Representations Were Inaccurate, Intending to Defraud Marks and Induce Reliance*

As explained in the SAC, "[Respondents] have been able to conceal their scheme from Plaintiff and Class Members because the foreign affiliates that collect foreign royalties are wholly owned or controlled by [Respondents]." 2-ER-109. Respondents thus had full knowledge that their royalty statements did not account for the intercompany charge assessed by their affiliates. *See* 2-ER-110 ("[Respondents'] omissions of material fact were intentional and made with knowledge as to the total foreign streaming revenues generated by their foreign affiliates."). Respondents knew and intended that Marks would rely upon these misrepresentations so as to induce acquiescence. *See* 2-ER-107-109.

"[A]t the pleading stage, intent and knowledge 'may be alleged generally.'" *Lemus v. Rite Aid Corp.*, No. SA CV 22-00253-DOC-ADS, 2022 WL 2721385, at *7 (C.D. Cal. July 7, 2022) (quoting Fed. R. Civ. Pro. 9(b)); *accord Odom v. Microsoft Corp.*, 486 F.3d 541, 553-54 (9th Cir. 2007). Moreover, because the facts regarding Respondents' fraudulent knowledge and intent are peculiarly within Respondents' control, Marks is further permitted to plead them upon information

and belief. *See Tavares v. Capitol Recs., LLC*, No. 12-cv-3059 YGR, 2013 WL 968272, at *4 (N.D. Cal. Mar. 12, 2013) (permitting allegation under Fed. R. Civ. Proc. 9(b), "on information and belief, that Capitol knew and intended that the[ir] royalty statements would mislead Plaintiffs."); *Davis v. Capitol Recs., LLC*, No. 12-cv-1602 YGR, 2013 WL 1701746, at *5–6 (N.D. Cal. Apr. 18, 2013) (same). Having done so, Marks' fraud allegations in the SAC are sufficient. *See* 2-ER-117-120.

3.     *Marks Justifiably Relied on Respondents' Misrepresentations*

California law prescribes a duty of disclosure between "parties entering into any kind of contractual agreement." *Nissan Motor Acceptance Cases*, 63 Cal. App. 5th 793, 826 (2021) (quoting *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336-37 (1997)). Respondents were in a contractual relationship with Marks for years by the time they implemented their fraudulent practices, and their deceptive royalty statements were issued pursuant to a contractual modification. 2-ER-110; 2-ER-55. Marks was entitled to rely on the presumed accuracy of those statements. *See Food Mkt. Merch., Inc. v. California Milk Processor Bd.*, No. 2:15-cv-01083-TLN-CKD, 2020 WL 2194013, at *9–10 (E.D. Cal. May 6, 2020) (plaintiff was entitled to rely on defendant's representations regarding royalties owed even after being denied access to the defendant's books and records).

Indeed, Marks had no reason to entertain the possibility that Respondents were misappropriating his royalties, as Respondents never disclosed the

intercompany charge. 2-ER-100-101, 2-ER-107-108. The only way to discover the charge's existence was to undertake a lengthy and expensive audit of Respondents' books and records, which Marks had no reason to do given the lack of any outward indication that his earnings were being reduced by the intercompany charges. 2-ER-109-111. At the very least, whether Marks' reliance on the accuracy of his royalty statements was justified poses a question of fact unsuited for early dismissal under Rule 9 or 12. *See UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc*., No. CV 14-3466 MMM (JPRx), 2015 WL 12746208, at *16 (C.D. Cal. Oct. 30, 2015) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.") (quoting *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995)).

4. *Respondents' Misrepresentations Damaged Marks*

"[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud." *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996). In pursuing such a claim, "contract remedies alone do not address the full range of policy objectives underlying the action," which includes "the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future." *Id.*

Here, Respondents induced Marks to modify the parties' existing written agreements with the understanding that he was being provided with a right to share

in the streaming royalties generated by his works. 2-ER-100-101, 2-ER-107-108. As Respondents assert, no such right was granted, their inducement was fraudulent, and Marks may pursue tort damages unencumbered by the economic loss rule. *See R Power Biofuels, LLC v. Chemex LLC*, No. 16-CV-00716-LHK, 2017 WL 1164296, at *9 (N.D. Cal. Mar. 29, 2017) ("A fraudulently induced standalone agreement *or a fraudulently induced modification to a contract* can satisfy the fraudulent inducement exception to the economic loss rule.") (emphasis added).

5. *Marks Has Satisfied Rule 9(b)'s Pleading Standard*

Although the district court acknowledged Marks had alleged the "who, what, when, where, and how" of Respondents' fraudulent omission and concealment regarding the total amount of foreign streaming revenues collected, it ultimately disregarded them as "including no particularized facts" regarding "what fraud occurred, when, and through what instrument." 1-ER-4-5, 1-ER-7. This claim cannot be squared with the SAC, which explicitly identifies what fraud occurred (the concealment of a significant hidden charge rendering Respondents' conveyed royalty rate for foreign streams inaccurate), when (after the recent implementation of the streaming royalty), and through what instrument (the royalty statements issued by Respondents). *See, e.g.*, 2-ER-100-101, 2-ER-107-109, 2-ER-114-115, 2-ER-117-119.

The foregoing allegations in the SAC are more than sufficient to satisfy the pleading standard under Fed. R. Civ. Proc. 9(b), given that Marks' fraud claim is based on an *omission* by Respondents (i.e., failure to disclose the charge being assessed on Marks' royalties). *See Cirulli v. Hyundai Motor Co*., No. SACV 08-0854 AG (MLGx), 2009 WL 5788762, at *4 (C.D. Cal. June 12, 2009) ("when an allegation rests on a claim of fraudulent omission, the Rule 9(b) standard is relaxed because 'a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act.'") (quoting *Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987)); *accord Mosqueda v. Am. Honda Motor Co.*, 443 F. Supp. 3d 1115, 1124 (C.D. Cal. 2020).

Courts in the Ninth Circuit have additionally recognized that "less specificity should be required of fraud claims when, based on the nature of the allegations, the defendant necessarily possesses the full information about the facts in controversy." *Cole v. Wright Med. Tech. Inc*., No 2:20-cv-03993-RGK-E, 2020 WL 5846460, at *5 (C.D. Cal. July 27, 2020); *accord Nayab*, 942 F.3d at 493 ("Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9, however, the pleader is not required to allege facts that are 'peculiarly within opposing party's knowledge,' and allegations 'based on information and belief may suffice,' so long as the allegations are accompanied by a statement of facts upon which the belief is founded."). Respondents, better than anyone, would have full and peculiar

knowledge of the scheme by which they decided to modify Marks' and other class members' royalty entitlements, then impose a significant hidden charge against those same entitlements. *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

The district court acknowledged neither of the foregoing considerations while dismissing Marks' fraud claim. Instead, it held that Marks was required to provide Respondents with the very information they had fraudulently concealed so that they could "meaningfully respond." 1-ER-7. Respondents' oppositions made clear that they understood precisely what practices Marks was complaining of, only disagreeing that there was anything improper about them. *See Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 789 (N.D. Cal. 2016). The SAC's "who, what, when, where, and how" allegations therefore properly put Respondents on notice.

With respect to the "who," while Marks has no insight at the motion to dismiss stage regarding the individuals employed by Respondents who implemented their fraudulent scheme, that does not act as a pleading impediment. *See Biggs v. Bank of Am. Corp.*, No. EDCV 15-00267-VAP (KKx), 2017 WL 11648863, at *5 (C.D. Cal. July 28, 2017) ("although a plaintiff ordinarily needs to identify the specific person who made the misrepresentation, this may be excused where it is unrealistic to expect plaintiff to have this information") (cleaned up). Marks identified UMG and Capitol, whose names appear clearly on the front and center of his royalty statements, and who are responsible for issuing those statements. 2-ER-110. The

district court's finding that this did not "narrow [Marks'] serious fraud accusations to a reasonable discrete … individual"[17] flies in the face of the relaxed pleading standard and serves only to promote corporate malfeasance. *See Intelligent SCM, LLC v. Qannu PTY LTD.*, No. CV 14-06417 MMM (VBKx), 2015 WL 13916822, at *33 (C.D. Cal. Mar. 2, 2015) ("the facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the fraud.").

With respect to the "what" and "how," Marks' allegations were anything but "ambiguous." *See* 1-ER-7. Respondents issued royalty statements with a precise number – 50% (*see* 1-ER-5) – for the royalty rate that Marks was to receive for the digital streaming of his works, yet failed to disclose a charge paid to their own foreign affiliates that reduced Marks' effective royalty rate to well below 50%.[18] 2-ER-100-101, 2-ER-107-108, 2-ER-110, 2-ER-117-119. Such omission is and was materially misleading, as there is no indication on the royalty statements (or anywhere else) that the amount being remitted to Marks is significantly less than the

---

[17] 1-ER-7.

[18] Marks was not required to attach a royalty statement to the SAC, as contracts may be pled based on their legal effect. 2-ER-114-115; *Constr. Protective Servs., Inc.*, 29 Cal. 4th at 198-99; *accord Miles*, 236 Cal. App. 4th at 402.

total foreign streaming revenues actually collected by Respondents through their affiliates. *Id.* Marks had no reason to believe he was receiving anything less than the full 50% called for by his royalty statements, particularly given that the corporate nature of Respondents' fraud placed this information exclusively within Respondents' knowledge and control. *See Intelligent SCM, LLC*, 2015 WL 13916822, at *33.

With respect to the "when" and "where," these are unnecessary for an omission claim. *Rivington Partners, LLC v. Rovens*, No. 21-cv-06151-LB, 2021 WL 8268051, at *6 (N.D. Cal. Dec. 10, 2021) ("fraud by omission has a relaxed pleading standard that does not require 'when' and 'where'"); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 878 (N.D. Cal. 2019). Marks has alleged the "when" as from the start of his streaming royalty entitlement (2-ER-110) and the "where" as across all foreign territories from which streaming royalties are collected (2-ER-100), which is sufficient under Rule 9(b)'s relaxed standard. *See Insight Psychology & Addiction, Inc. v. City of Costa Mesa*, No. SACV 20-00504 JVS (JDEx), 2021 WL 1218253, at *5 (C.D. Cal. Mar. 4, 2021).

As described above, and contrary to the district court's order, Marks' fraud cause of action satisfies the relevant pleading standard under Fed. R. Civ. P. 9(a) and 12(b)(6), particularly in light of this Court's relaxed Rule 9(b) standard in fraudulent omission cases and the corporate nature of the fraud alleged here.

**B.     Marks Has Sufficiently Alleged Breach of Contract**

Under California law, "the elements of a cause of action for breach of contract are: (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Marks has sufficiently alleged all four elements of his breach of contract claim.

1.     *Marks Has a Contractual Right to Streaming Royalties*

The parties do not dispute that Marks has written agreements with Capitol entitling him to be paid royalties when copies of his musical works are sold in record form. *See* 2-ER-78 (identifying written agreements). Rather, the parties' dispute centers on whether their conduct has created an implied right for Marks to be paid royalties when copies of his recordings are streamed in *digital* form.

As mentioned previously, "[a]n agreement to modify a written contract will be implied if the conduct of the parties is inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify it." *Daugherty Co.*, 14 Cal. App. 3d at 158 (citing *Garrison*, 25 Cal. 2d at 479). A contract may also be modified by contrary representations or conduct inducing reliance thereon by the other party. *Wagner v. Glendale Adventist Medical Center*, 216 Cal. App. 3d 1379, 1388 (1989). Both situations apply here, as Respondents' payment of a streaming royalty to Marks is inconsistent with the parties' written agreements, and Marks

relied on Respondents' contrary representations in their royalty statements by not seeking to extricate himself from those agreements. 2-ER-105-107.

The district court's order granting Respondents' motion to dismiss the SAC engages with none of this authority. Instead, it makes two erroneous claims:

The first claim is that Marks "does not 'present the material terms and conditions of [his streaming] contract in writing or in substance.'" 1-ER-7 (quoting *Frezza v. Google Inc*., No. 5:12-cv-00237-RMW, 2013 WL 1736788, at *4 (N.D. Cal. Apr. 22, 2013)). Yet the SAC *does* present the substance of the parties' streaming contract: Respondents agreed to pay Marks an unqualified 50% royalty on revenues generated by the digital streaming of his works (2-ER-101, 2-ER-107, 2-ER-114-115), and Marks accepted these royalties with the understanding that they constituted consideration for his continued acquiescence to Respondents' control of his works (2-ER-107-108, 2-ER-114-115). This bears no resemblance to *Frezza,* wherein the plaintiff could not explain how an advertisement constituted a binding contractual offer. *Frezza*, 2013 WL 1736788, at *4; *see Roley v. Google LLC*, No. 18-cv-07537-BLF, 2019 WL 1779974, at *5 (N.D. Cal. Apr. 23, 2019).

The second claim is that the SAC "points to no new legal obligation [Marks] assumed" in exchange for his streaming royalty, and that any alleged modification of the parties' agreement fails on that basis. 1-ER-7. The district court's truncation of what constitutes consideration under California law cannot negate the expansive

language of Cal. Civ. Code § 1605 or binding precedent regarding the sufficiency of forbearing a legal claim as consideration. *See MWS Wire Indus.*, 797 F.2d at 802. Indeed, inducing forbearance is the only logical reason Respondents would ever pay royalties not already required by contract, and Marks' forbearance not only is fairly implied, but actually occurred. *See Levine v. Tobin*, 210 Cal. App. 2d 67, 69 (1962) (a promise to forbear may be implied rather than express); *accord Union Oil Co. v. Terrible Herbst, Inc.,* 331 F.3d 735, 741 (9th Cir. 2003) ("An implied promise to forbear exercising a right can be consideration as readily as an explicit promise not to do so.") (citing Corbin on Contracts § 5.27 (1995)); *see also E-P Constructors, Inc. v. Peterson Tractor Co*., 192 Cal. App. 2d 518, 524-25 (1961) ("An actual forbearance is evidence of an agreement to forbear.").[19]

In sum, the variance between Marks' written agreements with Respondents and the parties' subsequent conduct creates genuine issues of fact regarding the parties' intent to modify those agreements to include an enforceable right to streaming royalties, one not susceptible to disposal on summary judgment, let alone a motion to dismiss. *Alvarado Orthopedic Research, L.P.*, 2013 WL 2351814, at *5. The district court's contrary findings on the matter are thus reversible error.

---

[19] *Cf. Wagner*, 216 Cal. App. 3d at 1388 (holding conduct antithetical to a written contract that induces reliance is sufficient to uphold modification of the contract, with no discussion of requiring new consideration for the modification).

### 2. *Marks Has Performed Under The Parties' Agreements*

There is no dispute that Marks performed under his written agreements by giving Capitol ownership over his recorded output with the Beach Boys. *Stewart*, 81 F. Supp. 3d at 960. Marks further performed under his agreements as modified by forbearing the institution of legal action until it became clear that Respondents were not honoring their end of the bargain. *Thane Int'l, Inc*, 2020 WL 7416171, at *9 (citing, inter alia, *Schumm v. Berg*, 37 Cal. 2d 174, 185 (1951)). Performance therefore poses no obstacle to Marks bringing his breach of contract claim.

### 3. *Respondents Breached Their Contractual Obligations*

Respondents argued to the district court that in order to challenge their arbitrary accounting practices, Marks "must identify an enforceable, bargained-for provision that entitles him to foreign digital streaming royalties based on 100% of revenues received 'at source.'" 2-ER-15-16. This overstates Marks' burden, which is simply to show that Respondents agreed to pay royalties for the digital streaming of Marks' works despite having no express obligations to do so under the parties' written agreements. *Alvarado Orthopedic Research, L.P.*, 2013 WL 2351814, at *5. If a resultant obligation to pay such royalties exists, the question is not whether Marks bargained for the royalties to be calculated 100% "at source," but whether it is proper for Respondents to artificially reduce the 50% figure expressed on their royalty statements. *Stewart*, 81 F. Supp. 3d at 966.

In *Stewart,* an artist sued their publisher for remitting less than the 50% figure represented on the artist's royalty statements through the use of inflated foreign sub-publisher fees. Notably, the artist's agreement was a "net receipts" agreement, meaning the publisher *had* bargained for the right to not calculate the artist's royalties "at source" – the very thing Respondents claim is fatal to Marks' complaint. *Id.* at 945. Yet even with that qualification in place, *Stewart* denied the publisher's summary judgment motion as to the propriety of the sub-publisher charges, holding the deductions could be improper if: (a) the publisher and sub-publishers operated as part of a single enterprise (*id.* at 963) or (b) the "grossly high" fees paid to the sub-publishers violated the implied covenant of good faith and fair dealing (*id.* at 966).

*Stewart* thus demonstrates that *even if* Respondents had no obligation to calculate Marks' royalties 100% "at source," the intercompany charges being deducted from Marks' royalties are still actionable under two separate theories supported in Marks' complaint. *See* 2-ER-100, 2-ER-102-103, 2-ER-109 (discussing singular enterprise between Respondents and their foreign affiliates); 2-ER-100-101, 2-ER-108-109(discussing the inflated nature of Respondents' intercompany charges). This is compounded by the fact that Respondents never communicated the 50% streaming figure on Marks' royalty statements was qualified so as to carve out royalties that Respondents leave overseas. 2-ER-107-108. Respondents therefore

failed to limit application of the 50% royalty to only monies received in the United States. *See Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 413 (2007) ("If appellants wished to modify or delimit the duties imposed on them by law … it was incumbent upon them to make that modification or delimitation an express subject of the contract.").

In light of the foregoing, Respondents' failure to remit all royalties owed to Marks means they have failed to substantially perform their obligations under the parties' agreements and are in material breach accordingly. *See Powertech Tech., Inc. v. Tessera, Inc*., No. C 11-6121 CW, 2014 WL 171830, at *6 (N.D. Cal. Jan. 15, 2014) ("The fact that PTI paid millions of dollars in royalties does not take away from the fact that it owed Tessera many millions more. PTI's president, Ping Chung Liao, admitted he intentionally withheld a substantial percentage of royalty payments. [Citation.] As a 'willful departure from the terms of the contract,' this withholding of royalty payments cannot constitute substantial performance.") (quoting *Posner v. Grunwald-Marx, Inc*., 56 Cal. 2d 169, 187 (1961)).

4.    *Respondents' Breach Caused Damage to Marks*

It is axiomatic that the failure to pay royalties owed under a contract harms the party entitled to those royalties. *See, e.g.*, *Tire Hanger Corp. v. Rotary Lift*, No. EDCV 15-2347 JGB (SPx), 2017 WL 10543660, at *13 (C.D. Cal. Oct. 4, 2017) ("failure to make royalty payments for sales exceeding the 500-unit sales threshold

caused Plaintiff to incur damages and its breach of contract claim to accrue"); *Fifty-Six Hope Rd. v. Jammin Java Corp.*, No. 2:16-cv-05810-SVW-MRW, 2017 WL 2719981, at *3 (C.D. Cal. Feb. 22, 2017) ("it is undisputed that the Plaintiffs have suffered damages totaling at least $371,324 as the result of the Defendant's breach of contract in failing to make the proper royalty payments."), *aff'd sub nom*, *Hope Rd. Merch. LLC v. Jammin Java Corp.*, 747 F. App'x 622 (9th Cir. 2019). Thus, if Respondents were obligated to pay Marks royalties that were improperly withheld, Marks has been damaged in an amount equal to the withheld royalties.

### C.      Marks Is Entitled to Declaratory Relief

####      1.      *Declaratory Relief May Be Used to Establish a Conditional Right to Rescind Marks' Agreements with Respondents*

"[T]here is no question that requests for declaratory relief can be stand-alone causes of action under California law." *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 287 n.3 (9th Cir. 2018) (Christen, J, concurring) (citing Cal. Civ. Code § 1060). Under Cal. Civ. Code § 1060, "[a]ny person interested . . . under a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the . . . contract." *See, e.g., Doe v. Gangland Prods.*, 730 F.3d 946, 960 (9th Cir. 2013) (upholding declaratory relief

claim pursuant to Cal. Civ. Code § 1060 based on demonstration of actual controversy regarding the parties' rights and duties under their agreement). [20]

Similarly, under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, [with minor exceptions], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *see United Studios of Self Def., Inc. v. Rinehart*, No. 8:18-cv-01048-DOC-DFM, 2019 WL 1109682, at *7–8 & n.1 (C.D. Cal. Feb. 22, 2019) (denying dismissal of claim "seek[ing] a declaration as to the right to rescind" a particular contract and asserting the court's ability "to declare the rights and legal relations of the parties under [their] agreements").[21]

---

[20] Under California law, "[t]he remedy of declarative relief is cumulative and does not restrict any other remedy. [Citation.]" *Doan v. State Farm General Ins. Co.*, 195 Cal. App. 4th 1082, 1094-95 (2011) "A claim for damages is [thus] not inconsistent with a claim for rescission" and only requires that "the relief shall not include 'duplicate or inconsistent items of recovery.'" *In re Real Estate Assocs. P'ship Litig.*, 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002) (quoting Cal. Civ. Code § 1692).

[21] Because Marks seeks state law claims for, inter alia, breach of contract and fraud in conjunction with his request for declaratory relief, the claim is properly entertained on a non-discretionary basis. *Gov't Emples. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225-26 (9th Cir. 1998) ("If a federal court is required to determine major issues of state law because of the existence of non-discretionary claims, the declaratory action should be retained to avoid piecemeal litigation.").

Marks' SAC sought a declaration that "[i]f [Respondents] do not have an ongoing obligation to pay for digital streaming under the Agreements, one subject to reasonable restriction on the amount of royalties that [Respondents] may withhold, the Agreements may be rescinded for failure of consideration and/or frustration of purpose." 2-ER-125. Such a declaration is appropriate because there is an ongoing controversy between Marks and Respondents with respect to the rights and obligations under their agreements. Specifically, the parties dispute whether Respondents have a contractual obligation to pay Marks a streaming royalty and whether Marks' rights to his recordings may be reclaimed in the absence of such an obligation. 2-ER-101. This relief is distinct from the damages sought under Marks' other causes of action and warrants independent maintenance of his declaratory relief claim. *See Vascular Imaging Prof'ls, Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1010-11 (S.D. Cal. 2019) (acknowledging that while breach of contract claim seeks retrospective damages, a declaratory relief claim regarding rescission "goes one step further" to address prospective rights); *Benson v. Ocwen Loan Servicing, LLC*, No. CV 11-06674 SJO (SSx), 2011 WL 13223540, at *5 (C.D. Cal. Sept. 30,

2011), *aff'd*, 562 F. App'x 567 (9th Cir. 2014) (denying motion to dismiss declaratory relief claim regarding future rights and liabilities).[22]

2.  *Rescission May Be Predicated On Frustration of Purpose Due to Streaming's Cannibalization of Physical Record Sales*

Marks and Capitol contracted with one another so that Capitol would manufacture and distribute physical copies of Marks' music to sell to customers, the parties then splitting the resultant revenues. 2-ER-99. With the market for physical music now utterly decimated by digital streaming, "the *fundamental reason of both parties* for entering into the contract has been frustrated." *Waegemann v. Montgomery Ward & Co.*, 713 F.2d 452, 454 (9th Cir. 1983) (citing *Cutter Labs. v. Twining*, 221 Cal. App. 2d 302, 315 (1963) (emphasis in original); *see also Lloyd v. Murphy*, 25 Cal. 2d 48, 53 (1944); *20th Century Lites, Inc. v. Goodman*, 64 Cal. App. 2d Supp. 938, 943 (1944) (noting the doctrine applies in cases of frustration of "the primary and principal purpose" for which the contract was made).

While only servicing the now-negligible non-digital sector of the recorded music industry remains possible, this would entitle Marks to only between 5% and 12% of 9% of the money earned by exploitation of his recordings, depriving Marks of a further 50% of 83% of the money earned by digital streaming of his recordings.

---

[22] *See also I.B. v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1005 (N.D. Cal. 2012) (declaratory relief may determine rights both prospectively and retrospectively).

2-ER-99-100, 2-ER-106-107; 2-ER-78, 2-ER-93. This deprivation, caused entirely

by an unprecedented and unforeseeable technological shift in the music industry,

easily qualifies as a substantial impairment "not fairly to be regarded as within the

risks that he assumed under the contract." *FPI Dev., Inc. v. Nakashima*, 231 Cal.

App. 3d 367, 399 (1991) (quoting Rest. 2d Contracts, § 265, com. a).

> 3. *Marks Was Not Required to Return All Past Royalties in Order to Seek a Declaration of Rights Regarding Rescission*

Cal. Civ. Code § 1692 provides in relevant part:

> A claim for damages is not inconsistent with a claim for relief based upon rescission. The aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled; but such relief shall not include duplicate or inconsistent items of recovery. If in an action or proceeding a party seeks relief based upon rescission, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties.

Cal. Civ. Code § 1692 essentially "restates the equity jurisprudence applicable

in the rescission context." *Hedging Concepts, Inc. v. First Alliance Mortg. Co*., 41

Cal. App. 4th 1410, 1422 (1996). The fundamental principle underlying that

jurisprudence "is that 'in such actions the court should do complete equity between

the parties' and to that end 'may grant any monetary relief necessary' to do so.

[Citation.]" *Runyan v. Pacific Air Industries, Inc*., 2 Cal. 3d 304, 316 (1970).

Rescission is intended to restore the contracting parties as nearly as possible to their

former positions and "'to bring about substantial justice by adjusting the equities between the parties' despite the fact that 'the status quo cannot be exactly reproduced.'" *Id*. (quoting *Lobdell v. Miller*, 114 Cal. App. 2d 328, 344 (1952). To achieve this objective, Cal. Civ. Code § 1692 specifically provides that "[a] claim for damages is not inconsistent with a claim for relief based upon rescission." Cal. Civ. Code § 1692. It further provides that the aggrieved party shall be awarded "complete relief," including restitution and "consequential damages." *Id.*

Given the foregoing, it is incongruous that Marks would be required to preemptively return all royalties received from Respondents to seek a declaration of rights relating to rescission. As explained, rescission may *approximate* the parties' former positions. *See Runyan*, 2 Cal.3d at 316; *see also Sharabianlou*, 181 Cal. App. 4th at 1144. Here, the best approximation of the *status quo ante* is to return control of Marks' intellectual property and relieve Respondents of their distribution obligations, each retaining their respective liquidated royalty shares. Yet even were a tender from Marks required, it need not occur prior to the Court actually holding that rescission is an available remedy in this case. *JDIS Grp., LLC*, 2021 WL 4813757, at *7. The service of Marks' complaint adequately discharged his only extant obligations in that regard. *See* Cal. Civ. Code § 1691; *Wong*, 237 Cal. App. 4th at 1386.

Because Marks had no obligation to preemptively return his royalties to Respondents before seeking a declaration of his rights as to rescission, and that was the only basis upon which the district court dismissed Marks' declaratory relief claim concerning such rights, the district court's dismissal should be reversed.

## VIII. CONCLUSION

For the aforementioned reasons, the district court committed reversible error by holding that Marks did not adequately plead his claims. This Court should therefore reverse the district court's order granting Respondents' motion to dismiss and remand with instructions that Marks has satisfied his pleading obligations and shall be entitled to take discovery in anticipation of seeking class certification.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

44

DATED:  September 6, 2022        **PEARSON, SIMON & WARSHAW, LLP**


By:        */s/ Daniel L. Warshaw*
            DANIEL L. WARSHAW

Daniel L. Warshaw (Bar No. 185365)
  dwarshaw@pswlaw.com
Bobby Pouya (Bar No. 245527)
  bpouya@pswlaw.com
Matthew A. Pearson (Bar No. 291484)
  mapearson@pswlaw.com
PEARSON, SIMON & WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8304

Neville L. Johnson, (Bar No. 66329)
  njohnson@jjllplaw.com
Douglas L. Johnson (Bar No. 209216)
  djohnson@jjllplaw.com
Daniel B. Lifschitz (Bar No. 285068)
  dlifschitz@jjllplaw.com
JOHNSON & JOHNSON LLP
439 North Canon Drive, Suite 200
Beverly Hills, CA 90210
Telephone: (310) 975-1080
Facsimile:  (310) 975-1095

980655.1                                          45

Jeffrey A. Koncius (Bar No. 189803)
  koncius@kiesel.law
Nicole Ramirez (Bar No. 279017)
  ramirez@kiesel.law
Kevin D. Zipser (Bar No. 334023)
  zipser@kiesel.law
KIESEL LAW LLP
8648 Wilshire Boulevard
Beverly Hills, CA 90211
Telephone: (310) 854-4444
Facsimile:  (310) 854-0812

*Attorneys for Plaintiff and Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, counsel of record for Appellant, certify:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,537 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.


Dated: September 6, 2022          */s/ Daniel L. Warshaw*
                                  Daniel L. Warshaw

                                  *Attorney for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify than on September 6, 2022, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 6, 2022        */s/ Daniel L. Warshaw*
                               Daniel L. Warshaw